## HAZEL-ATLAS GLASS CO. *v.* HARTFORD-EMPIRE CO.

No. 398.   Argued February 9, 10, 1944.—Decided May 15, 1944.

*Mr. Stephen H. Philbin,* with whom *Mr. Henry R. Ashton* was on the brief, for petitioner.

*Mr. Francis W. Cole,* with whom *Messrs. Walter J. Blenko, Edgar J. Goodrich,* and *James M. Carlisle* were on the brief, for respondent.

*Solicitor General Fahy, Assistant Attorney General Shea,* and *Messrs. Robert L. Stern* and *Melvin Richter* filed a brief on behalf of the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

This case involves the power of a Circuit Court of Appeals, upon proof that fraud was perpetrated on it by a successful litigant, to vacate its own judgment entered at a prior term and direct vacation of a District Court's decree entered pursuant to the Circuit Court of Appeals' mandate.

Hazel-Atlas commenced the present suit in November, 1941, by filing in the Third Circuit Court of Appeals a petition for leave to file a bill of review in the District Court to set aside a judgment entered by that Court against Hazel in 1932 pursuant to the Third Circuit Court of Appeals' mandate. Hazel contended that the Circuit Court of Appeals' judgment had been obtained by fraud and supported this charge with affidavits and exhibits. Hartford-Empire, in whose favor the challenged judgment had been entered, did not question the appellate court's power to consider the petition, but filed counter affidavits and exhibits. After a hearing the Circuit Court concluded that since the alleged fraud had been practiced on it rather than the District Court it would pass on the

issues of fraud itself instead of sending the case to the District Court. An order was thereupon entered denying the petition as framed but granting Hazel leave to amend the prayer of the petition to ask that the Circuit Court itself hear and determine the issue of fraud. Hazel accordingly amended, praying that the 1932 judgments against it be vacated and for such other relief as might be just. Hartford then replied and filed additional exhibits and affidavits. The following facts were shown by the record without dispute.

In 1926 Hartford had pending an application for a patent on a machine which utilized a method of pouring glass into molds known as "gob feeding." The application, according to the Circuit Court, "was confronted with apparently insurmountable Patent Office opposition." To help along the application, certain officials and attorneys of Hartford determined to have published in a trade journal an article signed by an ostensibly disinterested expert which would describe the "gob feeding" device as a remarkable advance in the art of fashioning glass by machine. Accordingly these officials prepared an article entitled "Introduction of Automatic Glass Working Machinery; How Received by Organized Labor," which referred to "gob feeding" as one of the two "revolutionary devices" with which workmen skilled in bottle-blowing had been confronted since they had organized. After unsuccessfully attempting to persuade the President of the Bottle Blowers' Association to sign this article, the Hartford officials, together with other persons called to their aid, procured the signature of one William P. Clarke, widely known as National President of the Flint Glass Workers' Union. Subsequently, in July 1926, the article was published in the National Glass Budget, and in October 1926 it was introduced as part of the record in support of the pending application in the Patent Office.

January 3, 1928, the Patent Office granted the application as Patent No. 1,655,391.

On June 6, 1928, Hartford brought suit in the District Court for the Western District of Pennsylvania charging that Hazel was infringing this "gob feeding" patent, and praying for an injunction against further infringement and for an accounting for profits and damages. Without referring to the Clarke article, which was in the record only as part of the "file-wrapper" history, and which apparently was not then emphasized by counsel, the District Court dismissed the bill on the ground that no infringement had been proved. 39 F. 2d 111. Hartford appealed. In their brief filed with the Circuit Court of Appeals, the attorneys for Hartford, one of whom had played a part in getting the spurious article prepared for publication, directed the Court's attention to "The article by Mr. William Clarke, former President of the Glass Workers' Union." The reference was not without effect. Quoting copiously from the article to show that "labor organizations of practical workmen recognized" the "new and differentiating elements" of the "gob feeding" patent owned by Hartford, the Circuit Court on May 5, 1932, held the patent valid and infringed, reversed the District Court's judgment, and directed that court to enter a decree accordingly. 59 F. 2d 399, 403, 404.

At the time of the trial in the District Court in 1929, where the article seemingly played no important part, the attorneys of Hazel received information that both Clarke and one of Hartford's lawyers had several years previously admitted that the Hartford lawyer was the true author of the spurious publication. Hazel's attorneys did not at that time attempt to verify the truth of the hearsay story of the article's authorship, but relied upon other defenses which proved successful. After the opinion of the Circuit Court came down on May 5, 1932, quoting the spurious

article and reversing the decree of the District Court, Hazel hired investigators for the purpose of verifying the hearsay by admissible evidence. One of these investigators interviewed Clarke in Toledo, Ohio, on May 13 and again on May 24. In each interview Clarke insisted that he wrote the article and would so swear if summoned. In the second interview the investigator asked Clarke to sign a statement telling in detail how the article was prepared, and further asked to see Clarke's files. Clarke replied that he would not "stultify" himself by signing any "statement or affidavit"; and that he would show the records to no one unless compelled by a subpoena. At the same time, he reinforced his claim of authorship by asserting that he had spent seven weeks in preparing the article.

But unknown to Hazel's investigator, a representative of Hartford, secretly informed of the investigator's view that Hazel's only chance of reopening the case "was to get an affidavit from someone, to the effect that this article was written" by Hartford's attorney, also had traveled to Toledo. Hartford's representative first went to Toledo and talked to Clarke on May 10, three days before Hazel's investigator first interviewed Clarke; and he returned to Toledo again on May 22 for a five-day stay. Thus at the time of the investigator's second interview with Clarke on May 24, representatives of both companies were in touch with Clarke in Toledo. But though Hartford's representative knew the investigator was there, the latter was unaware of the presence of the Hartford representative. On May 24, Hazel's investigator reported failure; the same day, Hartford's man reported "very successful results." Four days later, on May 28, Hartford's representative reported his "success" more fully. Clarke, he said, had been of "great assistance" and Hartford was in a "most satisfactory position"; it did not "seem wise to distribute copies of all the papers" the representative then had or

to "go into much detail in correspondence"; and Hartford was "quite indebted to Mr. Clarke" who "might easily have caused us a lot of trouble. This should not be forgotten. . . ." Among the "papers" which the representative had procured from Clarke was an affidavit signed by Clarke stating that he, Clarke, had "signed the article and released it for publication." The affidavit was dated May 24—the very day that Clarke had told Hazel's investigator he would not "stultify" himself by signing any affidavit and would produce his papers for no one except upon subpoena.

Shortly afterward Hazel capitulated. It paid Hartford $1,000,000 and entered into certain licensing agreements. The day following the settlement, Hartford's representative traveled back to Toledo and talked to Clarke. At this meeting Clarke asked for $10,000. Hartford's representative told him that he wanted too much money and that Hartford would communicate with him further. A few days later the representative paid Clarke $500 in cash; and about a month later delivered to Clarke, at some place in Pittsburgh which he has sworn he cannot remember, an additional $7,500 in cash. The reason given for paying these sums was that Hartford felt a certain moral obligation to do so, although Hartford's affidavits deny any prior agreement to pay Clarke for his services in connection with the article.

Indisputable proof of the foregoing facts was, for the first time, fully brought to light in 1941 by correspondence files, expense accounts and testimony introduced at the trial of the *United States* v. *Hartford-Empire Company et al.*, 46 F. Supp. 541, an anti-trust prosecution begun December 11, 1939. On the basis of the disclosures at this trial Hazel commenced the present suit.

Upon consideration of what it properly termed this "sordid story," the Circuit Court, one Judge dissenting, held, first, that the fraud was not newly discovered; sec-

ond, that the spurious publication, though quoted in the 1932 opinion, was not the primary basis of the 1932 decision; and third, that in any event it lacked the power to set aside the decree of the District Court because of the expiration of the term during which the 1932 decision had been rendered. Accordingly the Court refused to grant the relief prayed by Hazel.

Federal courts, both trial and appellate, long ago established the general rule that they would not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered. *Bronson* v. *Schulten,* 104 U. S. 410. This salutary general rule springs from the belief that in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered. This has not meant, however, that a judgment finally entered has ever been regarded as completely immune from impeachment after the term. From the beginning there has existed alongside the term rule a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry. *Marine Insurance Co.* v. *Hodgson,* 7 Cranch 332; *Marshall* v. *Holmes,* 141 U. S. 589. This equity rule, which was firmly established in English practice long before the foundation of our Republic, the courts have developed and fashioned to fulfill a universally recognized need for correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule. Out of deference to the deep-rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. *United States* v. *Throckmorton,* 98 U. S. 61. But where the occasion has demanded, where enforcement of the judgment is "mani-

festly unconscionable," *Pickford* v. *Talbott,* 225 U. S. 651, 657, they have wielded the power without hesitation.[1] Litigants who have sought to invoke this equity power customarily have done so by bills of review or bills in the nature of bills of review, or by original proceedings to enjoin enforcement of a judgment.[2] And in cases where courts have exercised the power, the relief granted has taken several forms: setting aside the judgment to permit a new trial, altering the terms of the judgment, or restraining the beneficiaries of the judgment from taking any benefit whatever from it.[3] But whatever form the relief has taken in particular cases, the net result in every case has been the same: where the situation has required, the court has, in some manner, devitalized the judgment even though the term at which it was entered had long since passed away.

Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Ap-

---

[1] See, e. g., *Art Metal Works* v. *Abraham & Strauss,* 107 F. 2d 940 and 944; *Publicker* v. *Shallcross,* 106 F. 2d 949; *Chicago, R. I. & P. Ry. Co.* v. *Callicotte,* 267 F. 799; *Pickens* v. *Merriam,* 242 F. 363; *Lehman* v. *Graham,* 135 F. 39; *Bolden* v. *Sloss-Sheffield Steel & Iron Co.,* 215 Ala. 334, 110 So. 574, 49 A. L. R. 1206. For a collection of early cases see Note (1880) 20 Am. Dec. 160.

[2] See *Whiting* v. *Bank of the United States,* 13 Pet. 6, 13; *Dexter* v. *Arnold,* 5 Mason 303, 308–315. See, also, generally, 3 Ohlinger's Federal Practice pp. 814–818; 3 Freeman on Judgments (5th ed.) § 1191; Note (1880) 20 Am. Dec. 160, *supra.*

[3] See 3 Freeman on Judgments (5th ed.) §§ 1178, 1779.

peals. Cf. *Marshall* v. *Holmes, supra*. Proof of the scheme, and of its complete success up to date, is conclusive. Cf. *United States* v. *Throckmorton, supra*. And no equities have intervened through transfer of the fraudulently procured patent or judgment to an innocent purchaser. Cf. *Ibid.; Hopkins* v. *Hebard*, 235 U. S. 287.

The Circuit Court did not hold that Hartford's fraud fell short of that which prompts equitable intervention, but thought Hazel had not exercised proper diligence in uncovering the fraud and that this should stand in the way of its obtaining relief. We cannot easily understand how, under the admitted facts, Hazel should have been expected to do more than it did to uncover the fraud. But even if Hazel did not exercise the highest degree of diligence, Hartford's fraud cannot be condoned for that reason alone. This matter does not concern only private parties. There are issues of great moment to the public in a patent suit. *Mercoid Corporation* v. *Mid-Continent Investment Co.*, 320 U. S. 661; *Morton Salt Co.* v. *G. S. Suppiger Co.*, 314 U. S. 488. Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

The Circuit Court also rested denial of relief upon the conclusion that the Clarke article was not "basic" to the Court's 1932 decision. Whether or not it was the primary basis for that ruling, the article did impress the Court, as

shown by the Court's opinion. Doubtless it is wholly impossible accurately to appraise the influence that the article exerted on the judges. But we do not think the circumstances call for such an attempted appraisal. Hartford's officials and lawyers thought the article material. They conceived it in an effort to persuade a hostile Patent Office to grant their patent application, and went to considerable trouble and expense to get it published. Having lost their infringement suit based on the patent in the District Court wherein they did not specifically emphasize the article, they urged the article upon the Circuit Court and prevailed. They are in no position now to dispute its effectiveness. Neither should they now be permitted to escape the consequences of Hartford's deceptive attribution of authorship to Clarke on the ground that what the article stated was true. Truth needs no disguise. The article, even if true, should have stood or fallen under the only title it could honestly have been given—that of a brief in behalf of Hartford, prepared by Hartford's agents, attorneys, and collaborators.

We have, then, a case in which undisputed evidence filed with the Circuit Court of Appeals in a bill of review proceeding reveals such fraud on that Court as demands, under settled equitable principles, the interposition of equity to devitalize the 1932 judgment despite the expiration of the term at which that judgment was finally entered. Did the Circuit Court have the power to set aside its own 1932 judgment and to direct the District Court likewise to vacate the 1932 decree which it entered pursuant to the mandate based upon the Circuit Court's judgment? Counsel for Hartford contend not. They concede that the District Court has the power upon proper proof of fraud to set aside its 1932 decree in a bill of review proceeding, but nevertheless deny that the Circuit Court possesses a similar power for the reason that the term during

which its 1932 judgment was entered had expired. The question, then, is not whether relief can be granted, but which court can grant it.

Equitable relief against fraudulent judgments is not of statutory creation. It is a judicially devised remedy fashioned to relieve hardships which, from time to time, arise from a hard and fast adherence to another court-made rule, the general rule that judgments should not be disturbed after the term of their entry has expired. Created to avert the evils of archaic rigidity, this equitable procedure has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations. It was this flexibility which enabled courts to meet the problem raised when leave to file a bill of review was sought in a court of original jurisdiction for the purpose of impeaching a judgment which had been acted upon by an appellate court. Such a judgment, it was said, was not subject to impeachment in such a proceeding because a trial court lacks the power to deviate from the mandate of an appellate court. The solution evolved by the courts is a procedure whereby permission to file the bill is sought in the appellate court. The hearing conducted by the appellate court on the petition, which may be filed many years after the entry of the challenged judgment, is not just a ceremonial gesture. The petition must contain the necessary averments, supported by affidavits or other acceptable evidence; and the appellate court may in the exercise of a proper discretion reject the petition, in which case a bill of review cannot be filed in the lower court. *National Brake Co.* v. *Christensen,* 254 U. S. 425, 430–433.

We think that when this Court, a century ago, approved this practice and held that federal appellate courts have the power to pass upon, and hence to grant or deny, peti-

tions for bills of review even though the petitions be presented long after the term of the challenged judgment has expired, it settled the procedural question here involved. *Southard* v. *Russell,* 16 How. 547.[4]  To reason otherwise would be to say that although the Circuit Court has the power to act after the term finally to deny relief, it has not the power to act after the term finally to grant relief.  It would, moreover, be to say that even in a case where the alleged fraud was on the Circuit Court itself, the relevant facts as to the fraud were agreed upon by the litigants, and the Circuit Court concluded relief must be granted, that Court nevertheless must send the case to the District Court for decision.  Nothing in reason or precedent requires such a cumbersome and dilatory procedure.  Indeed the whole history of equitable procedure, with the traditional flexibility which has enabled the courts to grant all the relief against judgments which the equities require, argues against it.  We hold, therefore, that the Circuit Court on the record here presented [5] had

---

[4] See also *Tyler* v. *Magwire,* 17 Wall. 253, 283: "Repeated decisions of this court have established the rule that a final judgment or decree of this court is conclusive upon the parties, and that it cannot be reexamined at a subsequent term, *except in cases of fraud,* as there is no act of Congress which confers any such authority." (Italics supplied.)

[5] We do not hold, and would not hold, that the material questions of fact raised by the charges of fraud against Hartford could, if in dispute, be finally determined on ex parte affidavits without examination and cross-examination of witnesses.  It should again be emphasized that Hartford has never questioned the accuracy of the various documents which indisputably show fraud on the Patent Office and the Circuit Court, and has not claimed, either here or below, that a trial might bring forth evidence to disprove the facts as shown by these documents.  And insofar as a trial would serve to bring forth additional evidence showing that Hazel was not diligent in uncovering these facts, we already have pointed out that such evidence would not in this case change the result.

Moreover, we need not decide whether, if the facts relating to the fraud were in dispute and difficult of ascertainment, the Circuit Court

both the duty and the power to vacate its own judgment and to give the District Court appropriate directions.

The question remains as to what disposition should be made of this case. Hartford's fraud, hidden for years but now admitted, had its genesis in the plan to publish an article for the deliberate purpose of deceiving the Patent Office. The plan was executed, and the article was put to fraudulent use in the Patent Office, contrary to law. U. S. C., Title 35, § 69; *United States* v. *American Bell Telephone Co.*, 128 U. S. 315. From there the trail of fraud continued without break through the District Court and up to the Circuit Court of Appeals. Had the District Court learned of the fraud on the Patent Office at the original infringement trial, it would have been warranted in dismissing Hartford's case. In a patent case where the fraud certainly was not more flagrant than here, this Court said: "Had the corruption of Clutter been disclosed at the trial . . ., the court undoubtedly would have been warranted in holding it sufficient to require dismissal of the cause of action there alleged for the infringement of the Downie patent." *Keystone Driller Co.* v. *Excavator Co.*, 290 U. S. 240, 246; cf. *Morton Salt Co.* v. *G. S. Suppiger Co.*, supra, 493, 494. So, also, could the Circuit Court of Appeals have dismissed the appeal had it been aware of Hartford's corrupt activities in suppressing the truth concerning the authorship of the article. The total effect of all this fraud, practiced both on the Patent Office and the courts, calls for nothing less than a complete denial of relief to Hartford for the claimed infringement of the patent thereby procured and enforced.

Since the judgments of 1932 therefore must be vacated, the case now stands in the same position as though Hartford's corruption had been exposed at the original trial.

---

here should have held hearings and decided the case or should have sent it to the District Court for decision. Cf. *Art Metal Works* v. *Abraham & Strauss, supra,* Note 1.

In this situation the doctrine of the *Keystone* case, *supra,* requires that Hartford be denied relief.

To grant full protection to the public against a patent obtained by fraud, that patent must be vacated. It has previously been decided that such a remedy is not available in infringement proceedings, but can only be accomplished in a direct proceeding brought by the Government. *United States* v. *American Bell Telephone Co., supra.*

The judgment is reversed with directions to set aside the 1932 judgment of the Circuit Court of Appeals, recall the 1932 mandate, dismiss Hartford's appeal, and issue mandate to the District Court directing it to set aside its judgment entered pursuant to the Circuit Court of Appeals' mandate, to reinstate its original judgment denying relief to Hartford, and to take such additional action as may be necessary and appropriate.

*Reversed.*

Mr. Justice Roberts:

No fraud is more odious than an attempt to subvert the administration of justice. The court is unanimous in condemning the transaction disclosed by this record. Our problem is how best the wrong should be righted and the wrongdoers pursued. Respect for orderly methods of procedure is especially important in a case of this sort. In simple terms, the situation is this. Some twelve years ago a fraud perpetrated in the Patent Office was relied on by Hartford in the Circuit Court of Appeals. The court reversed a judgment in favor of Hazel, decided that Hartford was the holder of a valid patent which Hazel had infringed and, by its mandate, directed the District Court to enter a judgment in favor of Hartford. This was done and, on the strength of the judgment, Hartford and Hazel entered into an agreement of which more hereafter. So long as that judgment stands unmodified, the agreement of the parties will be unaffected by anything involved in the suit under discussion. Hazel concededly now

desires to be in a position to disregard the agreement to its profit.

The resources of the law are ample to undo the wrong and to pursue the wrongdoer and to do both effectively with due regard to the established modes of procedure. Ever since this fraud was exposed, the United States has had standing to seek nullification of Hartford's patent.[1] The Government filed a brief as *amicus* below and one in this court. It has elected not to proceed for cancellation of the patent.[2]

It is complained that members of the bar have knowingly participated in the fraud. Remedies are available to purge recreant officers from the tribunals on whom the fraud was practiced.

Finally, as to the immediate aim of this proceeding, namely, to nullify the judgment if the fraud procured it, and if Hazel is equitably entitled to relief, an effective and orderly remedy is at hand. This is a suit in equity in the District Court to set aside or amend the judgment. Such a proceeding is required by settled federal law and would be tried, as it should be, in open court with living witnesses instead of through the unsatisfactory method of affidavits. We should not resort to a disorderly remedy, by disregarding the law as applied in federal courts ever since they were established, in order to reach one inequity at the risk of perpetrating another.

In a suit brought by Hartford against Hazel in the Western District of Pennsylvania charging infringement of Hartford's patent No. 1,655,391, a decree was entered against Hartford March 31, 1930, on the ground that Hazel had not infringed. On appeal, the Circuit Court

---

[1] *United States* v. *American Bell Telephone Co.*, 128 U. S. 315; 167 U. S. 224, 238.

[2] The facts with respect to the fraud practiced on the Patent Office have been known for some years.

of Appeals filed an opinion, May 5, 1932, reversing the judgment of the District Court and holding the patent valid and infringed. On Hazel's application, the time for filing a petition for rehearing was extended five times. On July 21, 1932, Hazel entered into a general settlement and license agreement with Hartford respecting the patent in suit and other patents, which agreement was to be effective as of July 1, 1932. Hazel filed no petition for rehearing and, on July 30, 1932, the mandate of the Circuit Court of Appeals went to the District Court. Pursuant to the mandate, that court entered its final judgment against Hazel for an injunction and an accounting. No such accounting was ever had because Hazel and Hartford had settled their differences.

November 19, 1941, Hazel presented to the Circuit Court of Appeals its petition for leave to file in the District Court a bill of review. Attached was the proposed bill. Affidavits were filed by Hazel and Hartford. The Circuit Court of Appeals heard the matter and made an order denying the petition for leave to file, holding that any fraud practiced had been practiced on the Circuit Court of Appeals and, therefore, that court should itself pass upon the question whether the mandate should be recalled and the case reopened. Leave was granted to Hazel to amend its petition to seek relief from the Circuit Court of Appeals. The order provided for an answer by Hartford and for a hearing and determination by the Circuit Court of Appeals.

The Circuit Court of Appeals, on the basis of the amended petition, the answer, and the affidavits, denied relief on the grounds: (1) that the fraud had not been effective to influence its earlier decision; (2) that the court was without power to deal with the case as its mandate had gone down and the term had long since expired; (3) that Hazel had been negligent and guilty of inexcusable delay in presenting the matter to the court; and

(4) that the only permissible procedure was in the District Court, where the judgment rested, by bill in equity in the nature of a bill of review. One judge dissented, holding that the court had power (1) to recall the cause; (2) to enter upon a trial of the issues made by the petition and answer, and (3) itself to review and revise its earlier decision, enter a new judgment in the case on the corrected record and send a new mandate to the District Court.

As I understand the opinion of this court, while it reverses the decision below, it only partially adopts the view of the dissenting judge, for the holding is: (1) that the court below has power at this date to deal with the matter either as a new suit or as a continuation of the old one; (2) that it can recall the case from the District Court; (3) that it can grant relief; (4) that it can hear evidence and act as a court of first instance or a trial court; (5) that such a trial as it affords need not be according to the ordinary course of trial of facts in open court, by examination and cross-examination of witnesses, but that the proofs may consist merely of ex parte affidavits; and (6) that such a trial has already been afforded and it remains only, in effect, to cancel Hartford's patent.

I think the decision overrules principles settled by scores of decisions of this court which are vital to the equitable and orderly disposition of causes,—principles which, upon the soundest considerations of fairness and policy, have stood unquestioned since the federal judicial system was established. I shall first briefly state these principles. I shall then as briefly summarize the reasons for their adoption and enforcement and, finally, I shall show why it would not be in the interest of justice to abandon them in this case.

1. The final and only extant judgment in the litigation is that of the District Court entered pursuant to the mandate of the Circuit Court of Appeals. The term of the

District Court long ago expired and, with that expiration, all power of that court to reexamine the judgment or to alter it ceased, except for the correction of clerical errors. The principle is of universal application to judgments at law,[3] decrees in equity,[4] and convictions of crime, though, as respects the latter, its result may be great individual hardship.[5] The rule might, for that reason, have been relaxed in criminal cases, if it ever is to be, for there, in contrast to civil cases, no other judicial relief is available.

In the promulgation of the Federal Rules of Civil Procedure this court took notice of the fact that terms of the district court vary in length and that the expiration of

[3] *Bank of United States* v. *Moss,* 6 How. 31, 38; *Roemer* v. *Simon,* 91 U. S. 149; *Phillips* v. *Negley,* 117 U. S. 665, 672, 678; *Hickman* v. *Fort Scott,* 141 U. S. 415; *Tubman* v. *Baltimore & Ohio R. Co.,* 190 U. S. 38; *Wetmore* v. *Karrick,* 205 U. S. 141, 151–2; *In re Metropolitan Trust Co.,* 218 U. S. 312, 320; *Delaware, L. & W. R. Co.* v. *Rellstab,* 276 U. S. 1, 5; *Realty Acceptance Corp.* v. *Montgomery,* 284 U. S. 547, 549.

[4] *Cameron* v. *McRoberts,* 3 Wheat. 591; *Sibbald* v. *United States,* 12 Pet. 488, 492; *Washington Bridge Co.* v. *Stewart,* 3 How. 413, 426; *Central Trust Co.* v. *Grant Locomotive Works,* 135 U. S. 207; *Wayne Gas Co.* v. *Owens-Illinois Co.,* 300 U. S. 131, 136; *Sprague* v. *Ticonic Bank,* 307 U. S. 161, 169.

[5] *United States* v. *Mayer,* 235 U. S. 55, 67. In this case one Freeman was convicted in the District Court. After he had taken an appeal to the Circuit Court of Appeals he filed, after the term had expired, a motion to set aside the judgment on the ground that a juror wilfully concealed bias against the defendant when examined on his *voir dire.* After hearing this motion the district judge found as a fact that the juror had been guilty of misconduct and that the defendant and his counsel neither had knowledge of the wrong nor could have discovered it earlier by due diligence. The district judge was in doubt whether, after the expiration of the term, he had power to deal with the judgment of conviction. The Circuit Court of Appeals certified the question to this court which, in a unanimous opinion, rendered after full argument by able counsel, held in accordance with all earlier precedents that, even in a case of such hardship, the District Court had no such power.

the term might occur very soon, or quite a long time, after the entry of a judgment. In order to make the practice uniform, Rule 60–B provides: "On motion the court, upon such terms as are just, may relieve a party or his legal representative from a judgment, order, or proceeding taken against him through his mistake, inadvertence, surprise, or excusable neglect. The motion shall be made within a reasonable time, *but in no case exceeding six months after such judgment, order, or proceeding was taken.* . . . This rule does not limit the power of a court (1) to entertain an action to relieve a party from a judgment, order, or proceeding. . . ." Thus there has been substituted for the term rule a definite time limitation within which a district court may correct or modify its judgments. But the salutary rule as to finality is retained and, after the expiration of six months, the party must apply, as heretofore, by bill of review,—now designated a civil action—to obtain relief from a judgment which itself is final so far as any further steps in the original action are concerned.

The term rule applies with equal force to an appellate court. Over the whole course of its history, this court has uniformly held that it was without power, after the going down of the mandate, and the expiration of the term, to rehear a case or to modify its decision on the merits.[6] And this is equally true of the circuit courts of appeal.[7]

---

[6] *Hudson* v. *Guestier*, 7 Cr. 1; *Jackson* v. *Ashton*, 10 Pet. 480; *Sibbald* v. *United States, supra,* 492; *Washington Bridge Co.* v. *Stewart, supra; Brooks* v. *Railroad Co.,* 102 U. S. 107; *Barney* v. *Friedman,* 107 U. S. 629; *Hickman* v. *Fort Scott, supra,* 419; *Bushnell* v. *Crooke Mining Co.,* 150 U. S. 82.

[7] *Ex parte National Park Bank,* 256 U. S. 131. "That court was powerless to modify the decree after the expiration of the term at which it was entered. If the omission in the decree had been adequately called to the court's attention during the term it would doubt-

The court below, unless we are to overthrow a century-and-a-half of precedents, lacks *power* now to revise its judgment and lacks *power* also to send its process to the District Court and call up for review the judgment entered on its mandate twelve years ago.[8]  No such power is inherent in an appellate court; none such is conferred by any statute.

2. The Circuit Court of Appeals is without authority either to try the issues posed by the petition and answer on the affidavits on file, or, to do as the dissenting judge below suggests, hold a full-dress trial.

The federal courts have only such powers as are expressly conferred on them.  Certain original jurisdiction is vested in this court by the Constitution.  Its powers as an appellate court are those only which are given by statute.[9]

The circuit courts of appeal are creatures of statute. No original jurisdiction has been conferred on them. They exercise only such appellate functions as Congress has granted.  The grant is plain.  "The circuit courts of appeal shall have *appellate jurisdiction* to review by appeal final decisions . . . in the district courts . . ."[10] Nowhere is there any grant of jurisdiction to try cases, to

less have corrected the error complained of; or relief might have been sought in this court by a petition for a writ of certiorari.  The bank failed to avail itself of remedies open to it."  (p. 133.)  The circuit courts of appeal have uniformly observed the rule thus announced. *Hart* v. *Wiltsee*, 25 F. 2d 863; *Nachod* v. *Engineering & Research Corp.*, 108 F. 2d 594; *Montgomery* v. *Realty Acceptance Corp.*, 51 F. 2d 642; *Foster Bros. Mfg. Co.* v. *Labor Board*, 90 F. 2d 948; *Wichita Royalty Co.* v. *City National Bank*, 97 F. 2d 249; *Hawkins* v. *Cleveland, C., C. & St. L. Ry. Co.*, 99 F. 322; *Walsh Construction Co.* v. *U. S. Guarantee Co.*, 76 F. 2d 240; *Waskey* v. *Hammer*, 179 F. 273.

[8] *Sibbald* v. *United States, supra*, 492; *Roemer* v. *Simon*, 91 U. S. 149; *In re Sanford Fork & Tool Co.*, 160 U. S. 247.

[9] *Ex parte Bollman*, 4 Cr. 75, 93.

[10] Judicial Code § 128 as amended; 28 U. S. C. 225.

enter judgments, or to issue executions or other final process.

". . . courts created by statute must look to the statute as the warrant for their authority; certainly they cannot go beyond the statute, and assert an authority with which they may not be invested by it, or which may be clearly denied to them." [11]

This court has never departed from the view that circuit courts of appeal are statutory courts having no original jurisdiction but only appellate jurisdiction.[12]

Neither this court [13] nor a circuit court [14] of appeals may hear new evidence in a cause appealable from a lower court. No suggestion seems ever before to have been made that they may constitute themselves trial courts, embark on the trial of what is essentially an independent cause and enter a judgment of first instance on the facts and the law. But this is what the opinion sanctions.

3. The temptation might be strong to break new ground in this case if Hazel were otherwise remediless. Such is

---

[11] *Cary* v. *Curtis*, 3 How. 236, 245. See *Sheldon* v. *Sill*, 8 How. 441, 449; *Kentucky* v. *Powers*, 201 U. S. 1, 24.

[12] *Whitney* v. *Dick*, 202 U. S. 132, 137; *United States* v. *Mayer*, *supra*, 65; *Realty Acceptance Corp.* v. *Montgomery*, *supra*, 549.

[13] *Russell* v. *Southard*, 12 How. 139, 158, 159; *United States* v. *Knight's Adm'r*, 1 Black 488; *Roemer* v. *Simon*, *supra*. In the *Russell* case Chief Justice Taney said: "It is very clear that affidavits of newly-discovered testimony cannot be received for such a purpose. This court must affirm or reverse upon the case as it appears in the record. We cannot look out of it, for testimony to influence the judgment of this court sitting, as an appellate tribunal. And, according to the practice of the court of chancery from its earliest history to the present time, no paper not before the court below can be read on the hearing of an appeal. Eden *v.* Earl Bute, 1 Bro. Par. Cas. 465; 3 Bro. Par. Cas. 546; Studwell *v.* Palmer, 5 Paige, 166.

"Indeed, if the established chancery practice had been otherwise, the act of Congress of March 3d, 1803, expressly prohibits the introduction of new evidence, in this court, on the hearing of an appeal from a circuit court, except in admiralty and prize causes."

[14] *Realty Acceptance Corp.* v. *Montgomery*, *supra*, 550, 551.

not the fact. The reports abound in decisions pointing the way to relief if, in equity, Hazel is entitled to any.

Since Lord Bacon's day a decree in equity may be reversed or revised for error of law,[15] for new matter subsequently occurring, or for after-discovered evidence. And this head of equity jurisdiction has been exercised by the federal courts from the foundation of the nation.[16] Such a bill is an original bill in the nature of a bill of review. Equity also, on original bills, exercises a like jurisdiction to prevent unconscionable retention or enforcement of a judgment at law procured by fraud, or mistake unmixed with negligence attributable to the losing party, or rendered because he was precluded from making a defense which he had. Such a bill may be filed in the federal court which rendered the judgment or in a federal court other than the court, federal or state, which rendered it.[17]

---

[15] A bill filed to correct error of law apparent on the record is called a strict bill of review and some rules as to time are peculiarly applicable to such bills. See *Whiting* v. *Bank of United States*, 13 Pet. 6, 13, 14, 15; *Shelton* v. *Van Kleeck*, 106 U. S. 532; *Central Trust Co.* v. *Grant Locomotive Works*, 135 U. S. 207. Street, Federal Equity Practice, § 2129 *et seq.* With this type of bill we are not here concerned.

[16] *Ocean Ins. Co.* v. *Fields*, 2 Story 59; *Whiting* v. *Bank of United States, supra; Southard* v. *Russell*, 16 How. 547; *Minnesota Co.* v. *St. Paul Co.*, 2 Wall. 609; *Purcell* v. *Miner*, 4 Wall. 519; *Rubber Co.* v. *Goodyear*, 9 Wall. 805; *Easley* v. *Kellom*, 14 Wall. 279; *Putnam* v. *Day*, 22 Wall. 60; *Buffington* v. *Harvey*, 95 U. S. 99; *Craig* v. *Smith*, 100 U. S. 226; *Shelton* v. *Van Kleeck, supra; Pacific Railroad* v. *Missouri Pacific Ry. Co.*, 111 U. S. 505; *Central Trust Co.* v. *Grant Locomotive Works, supra; Boone County* v. *Burlington & M. R. R. Co.*, 139 U. S. 684; *Hopkins* v. *Hebard*, 235 U. S. 287; *Scotten* v. *Littlefield*, 235 U. S. 407; *National Brake & Electric Co.* v. *Christensen*, 254 U. S. 425; *Simmons Co.* v. *Grier Bros. Co.*, 258 U. S. 82; *Jackson* v. *Irving Trust Co.*, 311 U. S. 494, 499.

[17] *Logan* v. *Patrick*, 5 Cr. 288; *Marine Ins. Co.* v. *Hodgson*, 7 Cr. 332; *Dunn* v. *Clarke*, 8 Pet. 1; *Truly* v. *Wanzer*, 5 How. 141; *Creath's Adm'r* v. *Sims*, 5 How. 192; *Humphreys* v. *Leggett*, 9 How. 297; *Walker* v. *Robbins*, 14 How. 584; *Hendrickson* v. *Hinckley*, 17 How.

Whether the suit concerns a decree in equity or a judgment at law, it is for relief granted by equity against an unjust and inequitable result, and is subject to all the customary doctrines governing the award of equitable relief.

New proof to justify a bill of review must be such as has come to light after judgment and such as could not have been obtained when the judgment was entered. The proffered evidence must not only have been unknown prior to judgment, but must be such as could not have been discovered by the exercise of reasonable diligence in time to permit its use in the trial. Unreasonable delay, or lack of diligence in timely searching for the evidence, is fatal to the right of a bill of review, and a party may not elect to forego inquiry and let the cause go to judgment in the hope of a favorable result and then change his position and attempt, by means of a bill of review, to get the benefit of evidence he neglected to produce. These principles are established by many of the cases cited in notes 16 and 17, and specific citation is unnecessary. The principles are well settled. And, in this class of cases as in others, although equity does not condone wrongdoing, it will not extend its aid to a wrongdoer; in

443; *Leggett* v. *Humphreys*, 21 How. 66; *Gue* v. *Tide Water Canal Co.*, 24 How. 257; *Freeman* v. *Howe*, 24 How. 450; *Kibbe* v. *Benson*, 17 Wall. 624; *Crim* v. *Handley*, 94 U. S. 652; *Brown* v. *County of Buena Vista*, 95 U. S. 157; *United States* v. *Throckmorton*, 98 U. S. 61; *Bronson* v. *Schulten*, 104 U. S. 410; *Embry* v. *Palmer*, 107 U. S. 3; *White* v. *Crow*, 110 U. S. 183; *Krippendorf* v. *Hyde*, 110 U. S. 276; *Johnson* v. *Waters*, 111 U. S. 640; *Richards* v. *Mackall*, 124 U. S. 183; *Arrowsmith* v. *Gleason*, 129 U. S. 86; *Knox County* v. *Harshman*, 133 U. S. 152; *Marshall* v. *Holmes*, 141 U. S. 589; *North Chicago Rolling Mill Co.* v. *St. Louis Ore & Steel Co.*, 152 U. S. 596; *Robb* v. *Vos*, 155 U. S. 13; *Howard* v. *De Cordova*, 177 U. S. 609; *United States* v. *Beebe*, 180 U. S. 343; *Pickford* v. *Talbott*, 225 U. S. 651; *Simon* v. *Southern Ry. Co.*, 236 U. S. 115; *Wells Fargo & Co.* v. *Taylor*, 254 U. S. 175.

other words, the complainant must come into court with clean hands.

4. Confessedly the opinion repudiates the unbroken rule of decision with respect to the finality of a judgment at the expiration of the term; that with respect to jurisdiction of an appellate court to try issues of fact upon evidence, and that with respect to the necessity for resorting to a bill of review to modify or set aside a judgment once it has become final. Perusal of the authorities cited will sufficiently expose the reasons for these doctrines. It is obvious that parties ought not to be permitted indefinitely to litigate issues once tried and adjudicated.[18] There must be an end to litigation. If courts of first instance, or appellate courts, were at liberty, on application of a party, at any time to institute a summary inquiry for the purpose of modifying or nullifying

---

[18] It has frequently been said that where the ground for a bill of review is fraud, review will not be granted unless the fraud was extrinsic. See *United States* v. *Throckmorton*, 98 U. S. 61. The distinction between extrinsic and intrinsic fraud is not technical but substantial. The statement that only extrinsic fraud may be the basis of a bill of review is merely a corollary of the rule that review will not be granted to permit relitigation of matters which were in issue in the cause and are, therefore, concluded by the judgment or decree. The classical example of intrinsic as contrasted with extrinsic fraud is the commission of perjury by a witness. While perjury is a fraud upon the court, the credibility of witnesses is in issue, for it is one of the matters on which the trier of fact must pass in order to reach a final judgment. An allegation that a witness perjured himself is insufficient because the materiality of the testimony, and opportunity to attack it, was open at the trial. Where the authenticity of a document relied on as part of a litigant's case is material to adjudication, as was the grant in the *Throckmorton* case, and there was opportunity to investigate this matter, fraud in the preparation of the document is not extrinsic but intrinsic and will not support review. Any fraud connected with the preparation of the Clarke article in this case was extrinsic, and, subject to other relevant rules, would support a bill of review.

a considered judgment, no reliance could be placed on that which has been adjudicated and citizens could not, with any confidence, act in the light of what has apparently been finally decided.

If relief on equitable grounds is to be obtained, it is right that it should be sought by a formal suit upon adequate pleadings and should be granted only after a trial of issues according to the usual course of the trial of questions of fact. A court of first instance is the appropriate tribunal, and the only tribunal, equipped for such a trial. Appellate courts have neither the power nor the means to that end.

On the strongest grounds of public policy bills of review are disfavored, since to facilitate them would tend to encourage fraudulent practices, resort to perjury, and the building of fictitious reasons for setting aside judgments.

5. I think the facts in the instant case speak loudly for the observance, and against the repudiation, of all the rules to which I have referred. The court's opinion implies that the disposition here made is justified by uncontradicted facts, but the record demonstrates beyond question that serious controverted issues ought to be resolved before Hazel may have relief.

In 1926 Hartford brought a suit for infringement of the Peiler Patent against Nivison-Weiskopf Company in the Southern District of Ohio. Counsel for the defendants in that case were Messrs. William R. and Edmund P. Wood of Cincinnati. About the same time, Hartford brought a similar suit for infringement against Kearns-Gorsuch Bottle Company, a subsidiary of Hazel. Counsel for Kearns were the same who have represented Hazel throughout this case.

In 1928 Hartford brought suit against Hazel in the Western District of Pennsylvania for a like infringement. The same counsel represented Hazel. The Ohio suits

came to trial first. In them a decision was rendered adverse to Hartford. Appeals were taken to the Circuit Court of Appeals of the Sixth Circuit, were consolidated, and counsel for the defendants appeared together in that court, which decided adversely to Hartford (58 F. 2d 701).

In the preparation for the defense of the Nivison suit, William R. Wood called upon Clarke and interviewed him in the presence of a witness. Clarke admitted that Hatch of Hartford had prepared the article published under Clarke's name. In the light of this fact the Messrs. Wood notified Hartford that they would require the presence of Hatch at the trial of the suit and Hatch was in attendance during that trial. Repeatedly during the trial, Hatch admitted to the Messrs. Wood that he was in fact the author of the article. It was well understood that the defendant wanted him present so that if any reference to or reliance upon the article developed they could call Hatch and prove the facts. There was no such reference or reliance.

As counsel for the various defendants opposed to Hartford were acting in close cooperation, Messrs. Wood attended the trial of the Hartford-Hazel suit in Pittsburgh, which must have occurred in 1929 or early 1930. (See 39 F. 2d 111.) One or other of the Messrs. Wood was present throughout that trial and Edmund P. Wood was in frequent consultation with the Hazel representatives and counsel. Hazel's counsel was the same at that trial as in the present case. The Messrs. Wood told Hazel's counsel and representatives that Clarke had admitted Hatch was the author of the article and that Hatch had also freely admitted the same thing. Hazel's counsel and representatives discussed at length, in the presence of Mr. Wood, the advisability of attacking the authenticity of the article. Counsel for Hazel, in these conferences, took the position that "an attack on the article might be a

boomerang in that it might emphasize the truth of the only statements in the article" which he regarded as of any possible pertinence. Mr. Wood's affidavit giving in detail the discussions and the conclusion of Hazel's counsel is uncontradicted, and demonstrates that Hazel's counsel knew the facts with regard to the Clarke article and knew the names of witnesses who could prove those facts. After due deliberation, it was decided not to offer proof on the subject.

The District Court found in favor of Hazel, holding that Hazel had not infringed. Hartford appealed to the Third Circuit Court of Appeals. In that court Hartford's counsel referred in argument to the Clarke article and the court, in its decision, referred to the article as persuasive of certain facts in connection with the development of glass machinery. The Circuit Court of Appeals for the Sixth Circuit rendered its decision in the Nivison and Kearns cases on May 12, 1932, and the Third Circuit Court of Appeals rendered its decision in the Hartford-Hazel case on May 6, 1932.

Counsel for Hazel was then, nearly ten years prior to the filing of the instant petition, confronted with the fact that, in its opinion, the Circuit Court of Appeals had accredited the article. Naturally counsel was faced with the question whether he should bring to the court's attention the facts respecting that article. As I have said, he asked and was granted five extensions of time for filing a petition for rehearing. Meantime negotiations were begun with Hartford for a general settlement and for Hazel's joining in the combination and patent pool of which Hartford was the head and front. At the same time, however, evidently as a precaution against the breakdown of the negotiations, Hazel's counsel obtained affidavits to be signed by the Messrs. Wood setting forth the facts which they had gleaned concerning the author-

ship of the Clarke article. These affidavits were intended for use in the Third Circuit Court of Appeals case for they were captioned in that case. Being made by reputable counsel who are accredited by both parties to this proceeding, they were sufficient basis for a petition for rehearing while the case was still in the bosom of the Circuit Court of Appeals. It is idle to suggest that counsel would not have been justified in applying to the court on the strength of them.

Had counsel filed a petition and attached to it the affidavits of the Messrs. Wood, without more, he would have done his duty to the court in timely calling its attention to the fraud which had been perpetrated. But more, the court would undoubtedly have reopened the case, granted rehearing, and remanded the case to the District Court with permission to Hazel to summon and examine witnesses. It is to ignore realities to suggest, as the opinion does, that counsel for Hazel was helpless at that time and in the then existing situation.

But counsel did not rest there. He commissioned an investigator who interviewed a labor leader named Maloney in Philadelphia. This man refused to talk but the investigator's report would make it clear to anyone of average sense that he knew about the origin of the article, and any lawyer of experience would not have hesitated to summon him as a witness and put him under examination. Moreover, the investigator interviewed Clarke and his report of the evasive manner and answers of Clarke convince me, and I believe would convince any lawyer of normal perception, that the Woods' affidavits were true and that Clarke would have so admitted if called to the witness stand. Most extraordinary is the omission of Hazel's counsel, although then in negotiation with Hartford for a settlement, to make any inquiry concerning Hatch or to interview Hatch, or to have him interviewed

when counsel had been assured that Hatch had no inclination to prevaricate concerning his part in the preparation of the article.

The customary modes of eliciting truth in court may well establish that in the circumstances Hazel's counsel deliberately elected to forego any disclosure concerning the Clarke article and to procure instead the favorable settlement he obtained from Hartford.

In any event, we know that, on July 21, 1932, Hartford and Hazel entered into an agreement, which is now before this court in the record in Nos. 7-11 of the present term, on appeal from the District Court for Northern Ohio. Under the agreement Hazel paid Hartford $1,000,000. Hartford granted Hazel a license on all machines and methods embodying patented inventions for the manufacture of glass containers at Hartford's lowest royalty rates. Hartford agreed to pay Hazel one-third of its net royalty income to and including January 3, 1945, over and above $850,000 per annum. At the same time, Hazel entered into an agreement with the Owens-Illinois Glass Company, another party to the Hartford patent pool and the conspiracy to monopolize the glass manufacturing industry found by the District Court.

In the autumn of 1933 counsel for Shawkee Company, defendant in another suit by Hartford, obtained documents indicating Hatch's responsibility for the Clarke article, and wrote counsel for Hazel inquiring what he knew about the matter. Hazel's counsel, evidently reluctant to disturb the existing status, replied that, while he suspected Hartford might have been responsible for the article, he did not *at the time of trial,* know *of the papers* which counsel for Shawkee had unearthed, and added that his recollection was then "too indefinite to be positive and I would have to go through the voluminous mass of papers relating to the various Hartford-Empire

litigations, including correspondence, before I could be more definite."

The District Court for Northern Ohio has found that the 1932 agreement and coincident arrangements placed Hazel in a preferred position in the glass container industry and drove nearly everyone else in that field into taking licenses from Hartford, stifled competition, and gave Hazel, as a result of rebates paid to it, a great advantage over all competitors in the cost of its product. It is uncontested that, as a result of the agreement, Hazel has been repaid the $1,000,000 it paid Hartford and has received upwards of $800,000 additional.

In 1941 the United States instituted an equity suit in Northern Ohio against Hartford, Hazel, Owens-Illinois, and other corporations and individuals to restrain violation of the antitrust statutes. That court found that the defendants conspired to violate the antitrust laws and entered an injunction on October 8, 1942. (46 F. Supp. 541.) Hazel and other defendants appealed to this court. The same counsel represented Hazel in that suit, and in the appeal to this court, as represented the company in the District Court and in the Third Circuit Court of Appeals in this case. In its brief in this court Hazel strenuously contended that the license agreement executed in 1932, and still in force, was not violative of the antitrust laws and should be sustained.

Of course, in 1941 counsel for Hazel faced the possibility that the District Court in Ohio might find against Hazel, and that this court might affirm its decision. Considerations of prudence apparently dictated that Hazel should cast an anchor to windward. Accordingly, November 19, 1941, it presented its petition for leave to file a bill of review in the District Court for Western Pennsylvania and attached a copy of the proposed bill. In answer to questions at our bar as to the ultimate purpose of this proceed-

ing, counsel admitted that, if successful in it, Hazel proposed to obtain every resultant benefit it could.

In the light of the circumstances recited, it becomes highly important closely to scrutinize Hazel's allegations. It refers to the use by the Circuit Court of Appeals of the Clarke article in the opinion and then avers:

"That although prior to the decision of this Court your petitioner suspected and believed that the article had been written by one of plaintiff's employees, instead of by Clarke, and had been caused by plaintiff to be published in the National Glass Budget, petitioner did not know then or until this year *material and pertinent facts* which, if petitioner had then known and been able to present to this Court, should have resulted in a decision for petitioner. [Italics added.]

"That such facts were disclosed to petitioner for the first time in suit of *United States of America* v. *Hartford, et al.,* in the United States District Court for the Northern District of Ohio, and are specified in paragraphs 4, 5 and 6 of the annexed bill of review, which is made a part hereof.

"That your petitioner could not have ascertained by the use of proper and reasonable diligence the newly discovered facts prior to the said suit, and that the newly discovered evidence is true and material and should cause a decree in this cause different from that heretofore made."

In the proposed bill of review these allegations are repeated and it is added that the new facts ascertained consist of the testimony of Hatch in the antitrust suit and five letters written by various parties connected with the conspiracy and a memorandum prepared by Hatch which were in evidence in that suit. The bill then adds:

"The new matter specified in the preceding paragraphs 4, 5 and 6 is material, it only recently became known to plaintiff, which could not have previously obtained it with due diligence, and such new evidence if it had been previously known to this Court and to the Circuit Court

of Appeals would have caused a decision different from that reached."

Neither the petition nor the bill is under oath but there is attached an affidavit of counsel for Hazel in which he states that in or before 1929 Hazel "had suspected, and I believed," that the Clarke article had been written by Hatch and that Hartford had caused the article to be published, adding: "having been so told by the firm of Messrs. Wood and Wood, Cincinnati lawyers, who said they had so been told by Clarke and also by Hatch." The affidavit also attaches the reports of the investigator above referred to and refers to the exhibits and testimony in the antitrust suit in Northern Ohio.

In the light of the facts I have recited, it seems clear that if Hazel's conduct be weighed merely in the aspect of negligent failure to investigate, the decision of this court in *Toledo Scale Co.* v. *Computing Scale Co.*, 261 U. S. 399, may well justify a holding, on all available evidence, that, at least, Hazel was guilty of inexcusable negligence in not seeking the evidence to support an attack upon the decree. But it is highly possible that, upon a full trial, it will be found that Hazel held back what it knew and, if so, is not entitled now to attack the original decree. In *Scotten* v. *Littlefield*, 235 U. S. 407, in affirming the denial of a bill of review, this court said that if the claim now made was "not presented to the Court of Appeals when there on appeal it could not be held back and made the subject of a bill of review, as is now attempted to be done." Repeatedly this court has held that one will not be permitted to litigate by bill of review a question which it had the opportunity to litigate in the main suit, whether the litigant purposely abstained from bringing forward the defense or negligently omitted to prosecute inquiries which would have made it available.[19]

---

[19] *Hendrickson* v. *Hinckley, supra,* 446; *Rubber Co.* v. *Goodyear, supra,* 806; *Crim* v. *Handley, supra,* 660; *Bronson* v. *Schulten, supra,*

And certainly an issue of such importance affecting the validity of a judgment, should never be tried on affidavits.[20]

As I read the opinion of the court, it disregards the contents of many of the affidavits filed in the cause and holds that solely because of the fraud which was practiced on the Patent Office and in litigation on the patent, the owner of the patent is to be amerced and in effect fined for the benefit of the other party to the suit, although that other comes with unclean hands [21] and stands adjudged a party to a conspiracy to benefit over a period of twelve years under the aegis of the very patent it now attacks for fraud. To disregard these considerations, to preclude inquiry concerning these matters, is recklessly to punish one wrongdoer for the benefit of another, although punishment has no place in this proceeding.

Hazel well understood the course of decision in federal courts. It came into the Circuit Court of Appeals with a petition for leave to file a bill of review, a procedure required by long-settled principles. Inasmuch as the judgment it attacked had been entered as a result of the action of the Circuit Court of Appeals, Hazel properly applied to that court for leave to file its bill in the District Court.[22] The respondent did not object on procedural grounds to the Circuit Court of Appeals considering and acting on the petition. That court of its own motion denied the petition and permitted amendment to pray relief there.

---

417, 418; *Richards* v. *Mackall, supra,* 188, 189; *Boone County* v. *Burlington & M. R. R. Co., supra,* 693; *Pickford* v. *Talbott, supra,* 658.

[20] *Jackson* v. *Irving Trust Co., supra,* 499; *Sorenson* v. *Sutherland,* 109 F. 2d 714, 719.

[21] *Creath's Adm'r* v. *Sims, supra,* 204.

[22] *Southard* v. *Russell, supra,* 570, 571; *Purcell* v. *Miner, supra,* 519; *Rubber Co.* v. *Goodyear, supra; National Brake & Electric Co.* v. *Christensen, supra,* 431; *Simmons Co.* v. *Grier Bros. Co., supra,* 91.

On the question what amounts to a sufficient showing to move an appellate court to grant leave to file a bill of review in the trial court, the authorities are not uniform. Where the lack of merit is obvious, appellate courts have refused leave,[23] but where the facts are complicated it is often the better course to grant leave and to allow available defenses to be made in answer to the bill.[24] In the present instance, I think it would have been proper for the court to permit the filing of the bill in the District Court where the rights of the parties to summon, to examine, and to cross-examine witnesses, and to have a deliberate and orderly trial of the issues according to the established standards would be preserved.

I should reverse the order of the Circuit Court of Appeals with directions to permit the filing of the bill in the District Court.

Mr. Justice Reed and Mr. Justice Frankfurter join in this opinion.

The Chief Justice agrees with the result suggested in this dissent.

---

[23] Purcell v. Miner, supra; Rubber Co. v. Goodyear, supra.

[24] Ocean Insurance Co. v. Fields, 2 Story 59; In re Gamewell Fire-Alarm Tel. Co., 73 F. 908; Raffold Process Corp. v. Castanea Paper Co., 105 F. 2d 126.