**APTIX CORPORATION,**
**Plaintiff/Counterclaim**
**Defendant–Appellant,**

and

**Meta Systems, Inc., Plaintiff/Counterclaim Defendant–Appellant,**

and

**Mentor Graphics Corporation,**
**Counterclaim Defendant,**

v.

**QUICKTURN DESIGN SYSTEMS, INC., Defendant/Counterclaimant–Appellee.**

**Nos. 00–1468, 00–1469.**

United States Court of Appeals, Federal Circuit.

DECIDED: Nov. 5, 2001.

Rehearing Denied Dec. 11, 2001.

Raphael V. Lupo, McDermott, Will & Emery, of Washington, DC, argued for plaintiff/counterclaim defendant-appellant Aptix Corporation. With him on the brief were Donna M. Tanguay, Mark G. Davis, and M. Miller Baker. Of counsel on the brief were Robert P. Taylor, Edwin H. Wheeler, and Erik K. Moller, Howrey Simon Arnold & White, LLP, of Menlo Park, CA.

Charles S. Crompton, Latham & Watkins, of Menlo Park, California, argued for plaintiff/counterclaim defendant-appellant Meta Systems, Inc. With him on the brief were David A. York, Rita A. Hao, and James L. Day.

J. Donald McCarthy, Lyon & Lyon LLP, of Los Angeles, California argued for defendant/counterclaimant-appellee Quickturn Design Systems, Inc. With him on the brief was James C. Brooks. Of counsel on the brief were James W. Geriak, Lyon & Lyon LLP, of Irvine, California; and Jeffrey A. Miller, Lyon & Lyon LLP, of San Jose, CA.

Before MAYER, Chief Judge, RADER, and LINN, Circuit Judges.

RADER, Circuit Judge.

On June 14, 2000, the United States District Court for the Northern District of California dismissed the patent infringement complaint of Aptix Corporation and Meta Systems, Inc., after ruling that Aptix's United States Patent No. 5,544,069 ('069 patent) is unenforceable. The trial court refused to enforce the '069 patent because Aptix submitted falsified engineering notebooks to the court.

Because substantial evidence supports the district court's finding of unclean hands, this court affirms the district court's dismissal of Aptix from the suit. Furthermore, because Meta, as Aptix's non-exclusive licensee, lacks standing to enforce the patent without Aptix, this court also affirms the district court's dismissal of Meta's complaint. However, because the district court exceeded its discretion by declaring the '069 patent unenforceable due to litigation misconduct, this court vacates that judgment.

## I.

Dr. Amr Mohsen, the founder, chairman, and chief executive officer of Aptix, is the sole inventor of the '069 patent. The '069 patent discloses and claims "field programmable" circuit boards that permit computer programmers to reconfigure the electronic components of an integrated circuit. Dr. Mohsen filed a patent application on September 20, 1989. The United States Patent Office issued the '069 patent on August 6, 1996.

Aptix licensed the '069 patent to Meta and Mentor Graphics Corporation, granting Meta the right to sue to enforce the patent in San Jose, California, where Quickturn Design Systems, Inc. is located. Under the agreement, Mentor agreed to advance Aptix the cost of enforcing the '069 patent against Quickturn. On February 26, 1998, Aptix and Meta jointly sued Quickturn for infringement of the '069 patent. Quickturn asserted counterclaims and added Mentor as a counterclaim defendant.

The local rules for the Northern District of California require patentees to disclose a date of conception for each asserted claim. N.D. Cal. Civ. L.R. 16–7(b)(3) (1998). On April 13, 1998, Aptix submitted to the court seventeen pages of Dr. Mohsen's alleged 1989 notebook as an initial proffer of a conception date. On April 18, 1998, Dr. Mohsen advised Aptix's counsel that he found another of his engineering notebooks, allegedly started in 1988. Relying on the 1988 notebook, Aptix and Meta listed July 31, 1988, as the date of conception for all asserted claims. Without this earlier notebook, Aptix later conceded, it would "have a hard row to hoe to avoid invalidating prior art." *Aptix Corp. v. Quickturn Design Sys.*, No. 98–00762, 2000 WL 852813, at *23 (N.D.Cal. June 14, 2000).

During discovery, Quickturn obtained a copy of a number of pages from a 1989 notebook that Dr. Mohsen had provided to Skjerven, Morrill, MacPherson, Franklin & Friel, patent counsel during prosecution of the '069 patent. Quickturn noticed substantial differences between this copy and the purported 1989 notebook Dr. Mohsen first supplied the court. The submission to the court contained extensive text and diagram additions not found in the version of the 1989 notebook obtained from Skjerven. When asked about these discrepancies in his deposition, Dr. Mohsen conceded that he added material to his notebooks after they had been signed.

During discovery, Aptix produced still another notebook, the "Ink On Photocopy" version of the 1989 notebook. This version of the 1989 notebook contained Dr. Mohsen's handwritten additions to the photocopied entries of an earlier version of the 1989 notebook. The trial court determined that the Ink–On–Photocopy version was a "dry run" for Dr. Mohsen's fabrications. *Id.* at *24. Once Dr. Mohsen had inked new material onto the rudimentary photocopied version, according to the district court, he inserted pages of the Ink–On–Photocopy version underneath the corresponding pages of the 1989 notebook to assist as a copying template. *Id.* Forensic evidence showed that the Ink On Photocopy version retained the impressions of Dr. Mohsen's pen as he copied the newly inked material into the evolving 1989 notebook. The Ink–On–Photocopy version was the source for the seventeen-page production to the court.

Thus, the record before the district court included four different notebook submissions: the seventeen pages originally submitted to the court from Mohsen's purported 1989 notebook, another notebook allegedly started in 1988, an original copy of the 1989 notebook that was used to prosecute the '069 patent (containing discrepancies from the seventeen-page

submission), and the Ink On Photocopy version of the 1989 notebook, which apparently served as the template for Dr. Mohsen's elaborations.

On November 24, 1998, Quickturn moved to compel production of the original notebooks for forensic testing. Dr. Mohsen had been insistent upon personally keeping the notebooks, locking them in a safe in his house. However, on December 14, 1998, Dr. Mohsen took the notebooks to work and left them in his car the entire day. That night, he purportedly found his car window broken and the notebooks gone. The trial court found that the "circumstances of the 'theft' strongly suggest that Amr Mohsen staged the incident." *Id.* at *26.

After the disappearance of the notebooks, Dr. Mohsen produced additional evidence to corroborate his asserted conception date. His 1989 Daytimer, for example, included various entries referring to the engineering notebooks. However, forensic evidence showed that these entries were written with an ink that was not manufactured until 1994, five years after the supposed entries.

Shortly before the scheduled date of an evidentiary hearing on spoliation of the notebooks (at which time Aptix would have had to demonstrate under Fed.R.Evid. 1004 that the original notebooks were not destroyed in bad faith), Dr. Mohsen purportedly received a priority mail package containing fragments of the missing notebooks. The package, which bore Dr. Mohsen's correct mailing address, had no return address but contained an anonymous note from "FL" stating: "These were discovered lately in our backyard. These look like important documents for you." The package contained invoices with Dr. Mohsen's address, which apparently provided the basis for "FL" to address the envelope. Significantly, however, those invoices had either the wrong zip code, or no zip code at all, even though the address on the package from "FL" included the proper zip code. The trial court found that "[i]t seems plain that Amr Mohsen addressed the envelope, or instructed someone else to address it, and simply slipped up in using the correct zip code." *Id.* at *27.

Referring to the 1988 notebook, the trial court noted that in five instances, Dr. Mohsen had first written "1998," and then overwritten the date to read "1988." Moreover, although Dr. Mohsen's brother, Aly Mohsen, had witnessed many pages of the notebook by writing "read and understood," the court noted that many of these pages were blank with nothing but a large "X," suggesting that Aly had witnessed a blank notebook, and that his brother later filled in text and diagrams. Indeed, all of Aly's signatures were written in the same ink, despite their purported dates on occasions 22 days apart. Furthermore, the court noted that none of Dr. Mohsen's colleagues, including his trial attorneys, patent prosecutors, and fellow executives, knew about the 1988 notebook until 1998. The trial court concluded that the 1988 notebook was a "complete fraud from bark to core, a notebook without a single genuine entry." *Id.* at *24.

On May 9–10, 2000, the trial court held an evidentiary hearing concerning the authenticity of the notebooks. Dr. Mohsen took the stand and asserted his Fifth Amendment privilege against self-incrimination in response to all questions. Thereafter, the trial court concluded that Aptix had attempted "to defraud the Court and to strengthen its patent through a premeditated and sustained campaign of lies and forgery." *Id.* at *27. The trial court determined that the '069 patent was unenforceable and dismissed the complaint, invoking the unclean hands doctrine as set forth in *Keystone Driller Co. v. General*

*Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293, 19 USPQ 228 (1933) ("*Keystone I*"). After finding this case exceptional under 35 U.S.C. § 285 (1994), the trial court ordered Aptix to pay Quickturn's reasonable attorney fees and costs.

On appeal to this court, Aptix challenges the finding of litigation misconduct and the award of attorney fees. Aptix contends that "the record ... does [not] reveal that Aptix submitted false information to the court, material or otherwise." Arguing that the record does not support findings of fraud, Aptix seeks reversal of the court's finding of unclean hands. Moreover, Aptix and Meta challenge the determination that misconduct during the enforcement of a patent can render the patent unenforceable. This court has jurisdiction under 28 U.S.C. § 1295(a)(1) (1994).

## II.

■ Both this court and the Ninth Circuit review a court's dismissal of a complaint for litigation misconduct for abuse of discretion. *Gen. Electro Music Corp. v. Samick Music Corp.,* 19 F.3d 1405, 1408, 30 USPQ2d 1149, 1151 (Fed.Cir.1994); *Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 379 (9th Cir.1988) (reviewing sanctions imposed by a district court, such as dismissal of a complaint for misconduct, for abuse of discretion). Both courts will not disturb such a determination absent a showing that it was based upon erroneous findings of fact, a misapplication or misinterpretation of applicable law, or a clear error of judgment. *Id.*

■ The record amply supports the district court's finding that Dr. Mohsen submitted the seventeen pages of his 1989 notebook to the court after adding new material to the signed and dated pages. Indeed, the Ink On Photocopy version retained the impressions of his pen as he added material to his purported 1989 note-

book. Moreover, after Dr. Mohsen invoked his Fifth Amendment privilege and refused to testify about the forgery, disappearance, and reappearance of the notebooks, the trial court was free to make adverse inferences against him. *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."). Even Aptix does not seem to dispute that the only straight-faced explanation for the theft of the notebooks and their subsequent mysterious return is that Dr. Mohsen himself staged the incidents—an inference that the trial court was free to draw.

Aptix nonetheless urges that the evidence of falsification of the 1988 notebook (its primary evidence to corroborate its asserted conception date) is not so utterly compelling as with the 1989 notebook. Therefore, Aptix seeks a determination that the trial court lacked clear and convincing evidence to find unclean hands. Contrary to Aptix's assertions, however, rarely, if ever, will litigation misconduct be so thoroughly documented. The record clearly and convincingly supports the district court's conclusion of extreme litigation misconduct.

The district court's finding of litigation misconduct fully justified its decision to invoke the unclean hands doctrine and dismiss Aptix from suit. This case is reminiscent of *Keystone I,* 290 U.S. at 240, 54 S.Ct. 146, in which the Supreme Court affirmed the dismissal of a patentee that engaged in fraud during litigation. In *Keystone I,* the patentee, in a prior proceeding, had purchased the silence of another inventor whose testimony would have provided grounds to invalidate the asserted patents. After successfully suppressing this testimony and obtaining an

injunction in the earlier action, the patentee relied on its earlier victory in support of another suit against General Excavator. In this later litigation, the earlier fraud emerged. By invoking against General Excavator a decree obtained by fraud, the patentee came to the court with unclean hands. Therefore, the Supreme Court denied all relief. *Id.* at 245, 54 S.Ct. 146 (quoting *Deweese v. Reinhard,* 165 U.S. 386, 390, 17 S.Ct. 340, 41 L.Ed. 757 (1897) ("A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.")). As in *Keystone I,* the district court in the present case had wide discretion to find Aptix remediless, and to dismiss its claim for want of equity.

▮ Moreover, the district court possessed ample discretion to award Quickturn attorney fees and costs. Without question, fraud and misconduct make this case exceptional under 35 U.S.C. § 285 (1994) and warrant a full compensation of Quickturn's reasonable attorney fees and costs.

▮ Upon dismissal of Aptix, Meta lost standing to sue in its own right. Only a patentee may bring an action for patent infringement. 35 U.S.C. § 281 (1994). Unless it holds "all substantial rights" under the patent, a licensee may not enforce a patent without the patentee. *Textile Prods., Inc. v. Mead Corp.,* 134 F.3d 1481, 1484, 45 USPQ2d 1633, 1635 (Fed.Cir. 1998). Meta is a non-exclusive licensee with only limited rights under the patent. Therefore, it lacks standing to sue without Aptix. The district court correctly dismissed Meta's complaint upon dismissal of Aptix.

## III.

▮ As further relief, the trial court declared the '069 patent unenforceable. Litigation misconduct, while serving as a basis to dismiss the wrongful litigant, does not infect, or even affect, the original grant of the property right. The doctrine of unclean hands does not reach out to extinguish a property right based on misconduct during litigation to enforce the right. Indeed neither the Supreme Court nor this court has ever declared a patent unenforceable due to litigation misbehavior. The Supreme Court's decision in *Keystone I,* upon which the district court primarily relied, illustrates that litigation misconduct does not affect the viability of the property right itself: "The governing principle is 'that whenever *a party* who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in *his* prior conduct, then the doors of the court will be shut against *him* in limine; the court will refuse to interfere on *his* behalf, to acknowledge *his* right, or to award *him* any remedy.'" 290 U.S. at 244–45, 54 S.Ct. 146 (quoting Pomeroy, Equity Jurisprudence (4th ed.) § 397 (emphasis added)). Leaving the patent right intact, the Supreme Court repeatedly stressed that litigation misconduct bars the litigant. Again in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, 61 USPQ 241 (1944), *overruled on other grounds by Standard Oil Co. v. United States,* 429 U.S. 17, 18, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976), another instance of extreme litigation misconduct, the Supreme Court "require[d] that Hartford be denied relief," but left the patent right intact. *Id.* at 251, 64 S.Ct. 997. Thus, the remedies for litigation misconduct bar the malfeasant who committed the misconduct. The property right itself remains independent of the conduct of a litigant.

This court's doctrines of inequitable conduct render the patent itself unenforceable to prevent "the enforcement of patents secured by fraud." *Smith Int'l, Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1578, 225 USPQ 889, 893 (Fed.Cir.1985). Inequitable conduct in the process of procuring a patent taints the property right itself. Thus, inequitable conduct furthers the "paramount interest" of ensuring that patents issue from "backgrounds free from fraud or other inequitable conduct." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381, 65 USPQ 133, 138 (1945). The process creating the patent right "demands that all facts relevant to [patentability] ... be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence." *Id.* Upon a showing of inequitable conduct during acquisition of the patent, courts declare the patent unenforceable because the property right is tainted *ab initio*. *See Hazel Atlas*, 322 U.S. at 251, 64 S.Ct. 997.

Thus, the remedies for litigation misconduct differ from the remedies for misconduct in acquisition of a property right. While inequitable conduct before the PTO renders the patent unenforceable by any party, the unclean hands doctrine bars only the offending party. *See Keystone I*, 290 U.S. at 244–45, 54 S.Ct. 146. Moreover, a finding of unclean hands generally does not prejudice the offending party in subsequent cases, but only provides a bar to relief in the case at hand. *See* McClintock on Equity (2d ed. 1948) § 26 ("The general principle is that equity will not lend its aid to enable a party to reap the benefit of his misconduct, or to enable him to continue it, but, where the misconduct has ceased and the right claimed in the suit did not accrue because of it, the misconduct will be held to be collateral and not to defeat the right to affirmative relief."); *Keystone I*, 290 U.S.

at 245, 54 S.Ct. 146 ("[Courts of equity] apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation."); *see also* Pomeroy on Equity (3d ed.1905) § 399.

The entire chain of *Keystone* cases also shows that the relief for unclean hands targets specifically the misconduct, without reference to the property right that is the subject of the litigation. The United States Court of Appeals for the Sixth Circuit, whose judgment the Supreme Court reviewed in *Keystone I*, directed the district court to dismiss Keystone's complaint without prejudice. *Gen. Excavator Co. v. Keystone Driller Co.*, 62 F.2d 48, 51, 16 USPQ 269, 271–72 (6th Cir.1932) ("The decrees of the District Court are reversed, and the causes are remanded, with instructions to dismiss the bills of complaint without prejudice to the prosecution of suits at law, or, indeed, to subsequent actions in equity upon the other patents in suit."). On motion for rehearing, the Sixth Circuit emphasized that it had not invalidated the patents, or adjudicated any of the rights of the parties *inter sese*, but rather that it had simply closed its doors against Keystone in this suit:

> The plaintiff is repelled as of the date of the filing of the bill and in respect of the maintenance of the action then instituted.... The fact that delay is thereby occasioned, or that the plaintiff has thereby suffered a loss of time and expense, is immaterial. The court has simply said: We will not hear you in this action although, not being a general avenger of the wrongs of humanity, it may be that you will not be in the future, and would not have been in the

past, repelled on account of your conduct.

*Gen. Excavator v. Keystone Driller Co.,* 64 F.2d 39, 40, 17 USPQ 517, 518 (6th Cir. 1933). On certiorari, the Supreme Court expressly recognized that the Sixth Circuit had directed dismissal "without prejudice," and affirmed. *Keystone I,* 290 U.S. at 244, 54 S.Ct. 146.

Only two years after issuing *Keystone I,* the Court again heard an infringement suit by Keystone asserting many of the same patents against other defendants. *Keystone Driller Co. v. Northwest Eng'g Corp.,* 294 U.S. 42, 55 S.Ct. 262, 79 L.Ed. 747, 24 USPQ 35 (1935) ("*Keystone II*"). While acknowledging the earlier unclean hands litigation, *id.* at 44 n. 2, 55 S.Ct. 262, the Court nonetheless adjudicated *Keystone II* on the merits, with no indication that the prior fraud tainted the later case. Thus, the entire history of the *Keystone* litigation underscores that the patent right is not affected by litigation misconduct.

This court notes its own characterization of *Keystone I* in previous dictum: "In *Keystone Driller,* the Supreme Court affirmed the Sixth Circuit's ruling that all five patents-in-suit were unenforceable due to unclean hands." *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.,* 910 F.2d 804, 810, 15 USPQ2d 1481, 1485 (Fed.Cir.1990). In *Consolidated Aluminum,* the inventor of Consolidated Aluminum's patents had committed fraud before the PTO. Thus, unenforceability of the property right itself was properly at issue in that case based on inequitable conduct. This court's broad characterization of *Keystone I* in *Consolidated Aluminum,* however, does not contradict a careful reading of the Supreme Court's reasoning and its action in affirming the Sixth Circuit.

## IV.

For reasons discussed above, if Aptix had procured its patent by inequitable conduct before the PTO, the trial court would have full discretion to declare the '069 patent unenforceable. *Hazel–Atlas,* 322 U.S. at 251, 64 S.Ct. 997; *see also, e.g., Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178, 33 USPQ2d 1823, 1827 (Fed.Cir. 1995); *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 877, 9 USPQ2d 1384, 1392 (Fed.Cir.1988) (en banc); *Smith,* 759 F.2d at 1578; *cf. J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed.Cir. 1984) ("Conduct before the PTO that may render a patent unenforceable is broader than 'common law fraud.'" (Citation omitted.)). Even presumably innocent licensees like Meta and Mentor would be properly barred from enforcing the patent, had the rights thereunder accrued through inequitable conduct. *See* McClintock on Equity (2d ed.1948) § 26.

In the present case, however, the record discloses no misconduct in acquisition of the patent right. Moreover, Meta and Mentor licensed the '069 patent from Aptix before the present litigation. The record does not show that either company participated in any wrongful conduct during litigation or before the PTO. Indeed, the trial court noted: "Meta may be a victim."

In the absence of any showing of misconduct before the PTO, the '069 patent remains a presumptively valid grant of personal property. *See* 35 U.S.C. § 261 (1994) ("Subject to the provisions of this title, patents shall have the attributes of personal property."). No case law from the Supreme Court or this court provides a basis for nullifying property rights granted by the United States when such property rights did not themselves accrue through inequitable conduct.

Despite this lack of authority, however, the trial court declared the '069 patent unenforceable as a form of relief. The

court called this relief a "penalty," necessary for deterring Aptix and other parties from engaging in future misconduct. *Aptix,* 2000 WL 852813, at *30. The court based its decision on *Keystone I* and the doctrine of unclean hands. As discussed above, however, the trial court's reliance on *Keystone I* was not fully justified, as the Supreme Court did not declare Keystone's patents unenforceable—to the contrary, it resolved yet another suit by Keystone on several of the same patents on the merits only two years later. *Keystone II,* 294 U.S. at 42, 55 S.Ct. 262. Nor does the doctrine of unclean hands provide a suitable basis for the trial court's judgment, as this equitable doctrine is not a source of power to punish. *Feltner,* 523 U.S. at 352–53, 118 S.Ct. 1279; *Mertens,* 508 U.S. at 270, 113 S.Ct. 2063 (White, J., dissenting); *Livingston,* 56 U.S. at 559. In declaring the '069 patent unenforceable based solely on misconduct during litigation, the trial court clearly exceeded the bounds of *Keystone I* and the doctrine of unclean hands.

## V.

Within the limits discussed above, courts are free to sanction bad faith conduct that arises during the course of litigation. These "inherent powers" to punish bad faith conduct during litigation are "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). "The power to punish for contempts is inherent in all courts." *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123 (quoting *Ex parte Robinson,* 19 Wall. 505, 510, 22 L.Ed. 205 (1874)). Although a particularly severe sanction, outright dismissal of a lawsuit is within the court's discretion. *Id.* (citing *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)). And, the " 'less se-

vere sanction' of an assessment of attorney's fees is undoubtedly within a court's inherent power as well." *Id.* at 45, 111 S.Ct. 2123 (citing *Hutto v. Finney,* 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)). Thus, the trial court did not abuse its discretion by denying relief to Aptix, or by ordering Aptix to pay attorney fees and costs.

## CONCLUSION

The trial court had broad discretionary power to fashion appropriate relief in this case, including denying any and all relief to Aptix, and ordering Aptix to compensate Quickturn for its reasonable attorney fees and costs. Indeed, this relief was entirely fitting. However, the record does not support a judgment rendering the '069 patent unenforceable. *Keystone I* and the doctrine of unclean hands do not provide a basis for punishing Aptix by nullifying the grant of a property right. Accordingly, this court affirms the district court's dismissal of the complaint and its award of attorney fees, and vacates the judgment of unenforceability.

## COSTS

Each party shall bear its own costs.

AFFIRMED IN PART and VACATED IN PART

MAYER, Chief Judge, dissenting-in-part.

Because a fraud upon the court is no less grave than a fraud on the Patent and Trademark Office, I would affirm the district court's holding that the '069 patent is unenforceable.

The maxim of unclean hands is applied broadly, giving substantial discretion to the officer of the court in its application. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 815,

65 S.Ct. 993, 89 L.Ed. 1381, 65 USPQ 133, 138 (1945) ("This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant."). It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46, 54 S.Ct. 146, 78 L.Ed. 293, 19 USPQ 228, 230 (1933) ("*Keystone I* "). The maxim itself is predicated upon the need to protect the integrity of the judicial system. "[The] doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.' " *Precision Instrument,* 324 U.S. at 814, 65 S.Ct. 993, 89 L.Ed. 1381, 65 USPQ at 138 (citing *Bein v. Heath,* 47 U.S. (6 How.) 228, 247, 12 L.Ed. 416 (1848)).

Had Mohsen's deception occurred in the Patent and Trademark Office ("PTO") rather than before the court, everyone agrees that the '069 patent would be unenforceable. There is no reason to reach a different result here. The duty of candor to the court is entitled to at least as much honor as that to the PTO. The courts have no greater resources to uncover fraud than the PTO. Although patent prosecutions are ex parte and judicial proceedings are adversarial, the PTO has the benefit of hundreds of experts in the relevant arts to make independent inquiries. The rationale of *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250, 61 USPQ 241, 245 (1944), applies: "[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated ... The public welfare demands that the agencies of public justice be not so

impotent that they must always be mute and helpless victims of deception and fraud."

There is no limit inherent in the doctrine of unclean hands that prevents declaring a patent unenforceable based on the post-issuance conduct of the party seeking relief. The governing principle of the doctrine is that " 'whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' " *Keystone I,* 290 U.S. at 244–45, 54 S.Ct. 146, 78 L.Ed. 293, 19 USPQ at 230 (quoting Pomeroy, *Equity Jurisprudence* § 397 (4th ed.)). Rendering the patent unenforceable for Mohsen's forgery of engineering notebooks purporting to establish the conception and reduction to practice of his invention is entirely consistent with this language. The district court properly refused to " 'acknowledge [the patentee's] right' " in that patent. *Id.*

Indeed, the unclean hands doctrine is the source of our ability to declare a patent unenforceable, for the well-recognized defense of inequitable conduct in the PTO. *See Hazel–Atlas,* 322 U.S. at 250–51, 64 S.Ct. 997, 88 L.Ed. 1250, 61 USPQ at 247; *see also Consolidated Aluminum Corp. v. Foseco Int'l Ltd.,* 910 F.2d 804, 812, 15 USPQ2d 1481, 1487 (Fed.Cir.1990) ("[W]e reject ... [the] invitation to limit a flexible doctrine of equity to conduct occurring before a court.... [W]hat we have termed 'inequitable conduct' is no more than the unclean hands doctrine applied to particular conduct before the PTO." (citations omitted)); *see also J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1561, 223 USPQ 1089, 1093 (Fed.Cir.1984) ("[A]t the

time the Patent Act was enacted Supreme Court cases had treated inequitable conduct as an 'unclean hands' type defense.") (superceded, but adopted in relevant part, by *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877, 9 USPQ2d 1384, 1392 (Fed.Cir.1988) (en banc)).

The Supreme Court's development of the doctrine makes this flexibility clear. *Keystone I* first permitted an accused infringer to assert unclean hands as a defense to infringement. 290 U.S. at 243–44, 54 S.Ct. 146, 19 · USPQ at 230–31. The patentee's post-issuance conduct of obtaining the agreement of a third party not to disclose a possible prior use of the invention, and the patentee's reliance on this deception to obtain a favorable judgment in an infringement action and to commence a second infringement suit, constituted unclean hands requiring the dismissal of the claims in the subsequent infringement case. *Id.*

At the time *Keystone I* was decided, the Court was limited by the rule that only the government had the ability to move to vacate a patent for fraud in its inception; private parties could not. *See Hazel–Atlas*, 322 U.S. at 251, 64 S.Ct. 997, 88 L.Ed. 1250, 61 USPQ at 247 ("It has previously been decided that such a remedy is not available in infringement proceedings, but can only be accomplished in a direct proceeding brought by the government." (citing *United States v. Am. Bell Tel. Co.*, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888))). Private parties were permitted to assert only invalidity defenses in infringement actions. *See Am. Bell Tel. Co.*, 128 U.S. at 370–72, 9 S.Ct. 90. As *Keystone Driller Co. v. Northwest Engineering Corp.*, 294 U.S. 42, 43 n. 2, 55 S.Ct. 262, 79 L.Ed. 747, 24 USPQ 35, 35–36 n. 2 (1935) ("*Keystone II*"), shows, the Court had not yet recognized its ability in an action between private parties to hold a patent unenforceable

for a patentee's deceptive conduct falling outside the scope of the enumerated invalidity defenses, regardless of whether the inequitable behavior was committed in the prosecution of the patent or in court. *See Hazel–Atlas*, 322 U.S. at 251, 64 S.Ct. 997, 88 L.Ed. 1250, 61 USPQ at 247; *Am. Bell Tel. Co.*, 128 U.S. at 370–72, 9 S.Ct. 90; *Mowry v. Whitney*, 81 U.S. (14 Wall) 434, 439, 20 L.Ed. 858 (1871) (dismissing action equivalent to a declaratory judgment of invalidity on the grounds that only the government "can institute judicial proceedings for ... vacating or rescinding the patent ..."); *see also* Donald S. Chisum, *Chisum on Patents*, § 19.03[1][a] at 19–150 (2000).

However, *Hazel–Atlas*, 322 U.S. at 250–51, 64 S.Ct. 997, 88 L.Ed. 1250, 61 USPQ at 247, subsequently confirmed that a court may declare a patent unenforceable in a private action under the unclean hands doctrine. The Court relied on *Keystone I* to hold that when deceptive conduct was practiced before both the PTO and then before the court, "nothing less than a complete denial of relief" to the patentee would suffice. *Id.* at 250, 64 S.Ct. 997, 61 USPQ at 247. *Hazel–Atlas* thus derived its conclusion that a patent may be held unenforceable for deception in the PTO from *Keystone I*'s refusal to enforce a patent for deception before the court. Unenforceability may be a remedy for either in the appropriate circumstances. *See Fraige v. Am.-Nat'l Watermattress Corp.*, 996 F.2d 295, 298 n. 3, 27 USPQ2d 1149, 1151 n. 3 (Fed.Cir.1993) ("Although *Hazel–Atlas* was not based on fraud arising during the course of an infringement action, the principles laid down by the Supreme Court are equally applicable here [to fraud committed in an infringement action]."); *cf. Precision Instrument*, 324 U.S. at 819, 65 S.Ct. 993, 89 L.Ed. 1381, 65 USPQ at 139 (dismissing the action for deception before the PTO

and the court based on the "public policy against the assertion and enforcement of patent claims infected with fraud and perjury.").

Here, the district court held that the only way to protect the judicial proceedings from Mohsen's deceptions was to declare the '069 patent unenforceable. His forgery was pervasive, long-standing, and wanton. It was committed in the context of a series of inter-related patent litigations among the parties concerning related technology in courts in many jurisdictions, as well as an antitrust action and a takeover attempt. Closing the door to one courtroom would merely lead to prompt refiling in another, and would be of little deterrence to subsequent attempts to undermine the integrity of the judicial process.

That Mohsen's forged documents infected the evidence of the conception and reduction to practice of the invention bolsters the conclusion that the patent should not be enforced. Although the record does not fully develop the issue, it appears that he was seeking to avoid potentially invalidating prior art with his forgery, intending to swear behind the date of his patent application. Thus, the fraud concerns the validity of an issued patent, a matter of public concern. *See Fraige*, 996 F.2d at 298, 27 USPQ2d at 1152; *Mercoid Corp. v. Mid–Continent Inv. Co.*, 320 U.S. 661, 666, 64 S.Ct. 268, 88 L.Ed. 376, 60 USPQ 21, 24 (1944); *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *Precision Instrument*, 324 U.S. at 816, 65 S.Ct. 993, 89 L.Ed. 1381, 65 USPQ at 138 ("The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies ... are kept within their legitimate scope.").

Had Mohsen succeeded, he might unjustly have retained or enlarged the scope of his property right, avoided a finding of obviousness or anticipation, and thus remained the owner of valid patent claims where he should have none. As the district court observed, the patent would be strengthened through its testing in litigation and in reliance upon the fraudulent documentation and testimony. Aptix would likely be able to command a higher price for it (in license or assignment), and would more readily be able to obtain settlements from potential infringers than if it had not survived a challenge to its validity. This strengthened patent could be helpful in obtaining infringement verdicts in subsequent litigation, resulting in a chain of judgments based on the same fraud. *See* Donald S. Chisum, *Chisum on Patents*, § 19.02[2][a] at 19–51 (2000) ("A prior judgment of validity cannot bind non-parties to a suit. Nevertheless, under the doctrine of comity, a court will give some weight to prior adjudications ... based on the same evidence."). Permitting the possibility of such a chain of judgments tainted with deception is precisely what the Supreme Court sought to avoid in *Keystone I, Hazel–Atlas*, and *Precision Instrument*.

This type of deception taints the patent itself. The documentary record of the invention has been permanently blotched. The forgery is sufficiently pervasive that it is difficult to tell if any of the purported engineering notebooks and supporting documents are authentic. Thus, the effects of Mohsen's conduct before the court would not necessarily be eradicated in an action brought by another party. If the patent is not held unenforceable, a subsequent owner may attempt in litigation to establish a date of conception and reasonable diligence in reduction to practice before the date of the patent's application. To permit this possibility is to countenance the continued involvement of the courts in sorting through the muddy morass of Mohsen's forgeries and dishonest testimony. The unclean hands doctrine does not permit

this boon to the forger and stain on the courts. *See Precision Instrument,* 324 U.S. at 814, 65 S.Ct. 993, 89 L.Ed. 1381, 65 USPQ at 138. Therefore, we do not exceed the limits of equity in refusing to enforce the patent. *Mercoid,* 320 U.S. at 666, 64 S.Ct. 268, 88 L.Ed. 376, 60 USPQ at 24 ("The patent is a privilege.").

In other contexts, we have not been so quick to confine the consequences of a patentee's fraud. For example, even if inequitable conduct in a patent's prosecution only directly concerns one of the claims, we hold that it is fatal to the entire patent. *See Kingsdown Med. Consultants,* 863 F.2d at 877, 9 USPQ2d at 1392 (en banc) ("When a court has finally determined that inequitable conduct occurred in relation to one or more claims during prosecution of the patent application, the entire patent is rendered unenforceable."). There is no reason to become parsimonious with equity here.

With respect to Meta, as the patent's licensee, it derives its rights in the '069 patent entirely through Aptix and has no standing to sue in its own right. *See* 35 U.S.C. § 281 (1994). To the extent that Meta would be harmed by our refusal to recognize Aptix's right to the patent, its action is against Aptix. Had Aptix's deception initially been before the PTO, the patent would be unenforceable, and Meta would lose all its rights in the patent even if it had no knowledge of the misconduct. Besides, as the driving force behind the Aptix patent litigation, Meta had ample notice of the alleged fraud and ample opportunity to require the testing of the veracity of the documents that it and Aptix continued to rely on. The district court made no findings about whether Meta itself had clean hands. However, willful blindness to another's wrongful acts and continued reliance upon them could rise to the level of intentional or unconscionable conduct.